**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-01170-001-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Joseph Minh McReynolds, | |
| Defendant. | |

Pending before the Court is the Motion to Suppress of Defendant Joseph Minh McReynolds (Doc. 33). For the following reasons the motion is denied.

## BACKGROUND

On June 19, 2018, Officer G. Varela of the Colorado River Indian Tribes Police Department ("CRITPD") pulled over a car for speeding—he clocked the car traveling at 51 miles per hour in a 35 mile-per-hour zone—in Parker, Arizona. Officer Varela, while an employee of the CRITPD, is also certified by the Arizona Peace Officer Standards and Training Board, and so is authorized to enforce both tribal and state law. Officer Varela was wearing a body camera during the incident and recorded his interactions with the two individuals in the car: Travis Malara, the driver, and Defendant, the passenger.

Officer Varela approached the car and asked Malara if he was aware how fast he had been driving. Officer Varela asked Malara for his driver's license, and Malara stuttered as he answered. Officer Varela interpreted this action as Malara acting nervously. He therefore requested identification from Defendant as well. Because Officer Varela

believed Malara was acting nervously, he asked the two men if they had any weapons. Defendant informed Officer Varela that he had a firearm in the front-right pants pocket.

Officer Varela then informed Defendant that he would come around to the passenger side of the vehicle and remove the weapon from the vehicle. He told Defendant to not make any sudden moves and keep his hands in view. Officer Varela approached Defendant, asked if the gun had ammunition chambered (it did), and removed it from Defendant's pocket. When asked if he had any other weapons, Defendant said no.

Officer Varela then called in Malara's and Defendant's names to dispatch to conduct a records check. While the check was being conducted, Officer Varela asked the two men if there were any drugs in the car and if Defendant had anything else on his person. Defendant said no. Officer Varela then called in the firearm's serial number to dispatch. While the records checks were being performed, Officer Varela and other officers who had arrived removed Malara and Defendant from the vehicle.

The records check revealed that Malara had a non-extraditable warrant issued for him in California, and that there may also have been a "mental health order" for Malara. Dispatch also informed Officer Varela that Defendant had "major priors in the last seven years" and that he was currently on supervised release. Officer Varela therefore decided to request a more in-depth check of Defendant to determine if he was a prohibited possessor. However, dispatch was unable to contact Defendant's probation officer to confirm that he was a prohibited possessor. The stop ended less than twenty minutes after it began, but Officer Varela informed Defendant that CRITPD would be keeping Defendant's firearm until it could confirm that he was not a prohibited possessor. Officer Varela did not issue a citation to Malara, but instead gave him a verbal warning.

Two days later, Defendant's probation officer informed CRITPD that Defendant was a prohibited possessor. CRITPD communicated the information to the United States Attorney's Office, which then filed this action against Defendant, charging him with a single count of prohibited possession. Defendant now moves to suppress all evidence obtained during the traffic stop as well as any statements he allegedly made while he was

detained by Officer Varela during the traffic stop.

**DISCUSSION**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Traffic stops by law enforcement implicate the Fourth Amendment "because stopping an automobile and detaining its occupants constitute a seizure . . . even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). For a traffic stop to be constitutional, law enforcement officers must have "reasonable suspicion" that a person in the car is breaking the law. *Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530, 536 (2014); *Choudhry*, 461 F.3d at 1100 (*citing United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000)). "Officers have reasonable suspicion when specific, articulable facts[,] together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Choudhry*, 461 F.3d at 1100 (quoting *United States v. Montero-Camargo*, 280 F.3d 1122, 1129 (9th Cir. 2000) (en banc)) (internal quotation marks omitted).

**I. Analysis**

    **A. Officer Varela had authority to make the traffic stop.**

Defendant contends that Officer Varela, as a member of the CRITPD, lacked authority to enforce the law against Malara and Defendant because neither are tribal members or nonmember Indians. "An Indian tribe's authority to enforce criminal laws on tribal land is nuanced. On tribal land, a tribe has inherent powers as a separate sovereign to enforce criminal laws, but only as to its tribal members and nonmember Indians." *United States v. Cooley*, 919 F.3d 1135, 1141 (9th Cir. 2019) (citing *United States v. Lara*, 541 U.S. 193, 197–99 (2004)). Tribes' "authority over non-Indians is more limited. A tribe has no power to enforce tribal criminal law as to non-Indians, even when they are on tribal land." *Id.* But "[t]ribal officers are often delegated authority by a state of the federal

government to act broadly on its behalf." *Id.* at 1141 n.2. The normal limitations on the authority of tribal law enforcement officers "do not apply to deputized officers." *Id.*

But Officer Varela, although a member of CRITPD, a tribal entity, is also an AZPOST-certified officer, and thus has authority to enforce Arizona state law. (*See* Government's Exhibit 1). Defendant's argument that Officer Varela lacked authority to conduct the traffic stop is therefore without merit.

### B. The traffic stop was justified.

Law enforcement officers have reasonable suspicion sufficient to justify a traffic stop if they observe a traffic violation. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Willis*, 431 F.3d 709, 714–17 (9th Cir. 2005). Courts look at the totality of the circumstances when determining whether reasonable suspicion has been established. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Officer Varela's decision to pull over Malara's vehicle did not violate the Fourth Amendment. Officer Varela's report indicates that he observed the vehicle traveling sixteen miles per hour over the posted speed limit in violation of both tribal and state law. *See* Ariz. Rev. Stat. § 28-701; CRIT Law and Order Code § 16-6801. Officer Varela testified that he used both visual estimation and a radar gun to determine that Malara was speeding. Defendant argues that there is no evidence establishing the reliability of either the radar gun or Officer Varela's visual estimation. But Officer Varela's testimony at the hearing established that his vision was unimpaired and that he had a clear view of the vehicle on the day of the stop. His testimony further established that his radar gun was in working order and that he checked the radar gun's performance each day before beginning his patrol. Officer Varela's use of the radar gun to clock the vehicle's speed, together with his visual estimation, is sufficient reasonable suspicion to justify the traffic stop. *United States v. Cruz-Castro*, 378 F. App'x 632, 634 (9th Cir. 2010).

### C. Officer Varela was justified in removing Defendant's firearm.

Since traffic stops may be "especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), "[t]he risk of harm to both the police and

the occupants is minimized if the officers routinely exercise unquestioned command of the situation," *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (*quoting Michigan v. Summers*, 452 U.S. 692, 703 (1981)). During a traffic stop, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Such steps may reasonably include questioning the vehicle's occupants regarding any weapons that may be in the car. *See United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005) ("Once the police stopped Willis, they could, within reason, . . . question Willis about weapons for their own safety.").

As previously discussed, Officer Varela had sufficient reasonable suspicion to justify pulling Malara's car over. Once the stop had lawfully happened, Officer Varela was permitted to ask questions of the vehicle's occupants that were unrelated to the reason for the traffic stop even if he lacked separate reasonable suspicion to ask whether either of the men had weapons. *See United States v. Mendez*, 476 F.3d 1077, 1080–81 (9th Cir. 2007) (holding that so long as officers' questioning does not prolong the stop, "expanded questioning need not have been supported by separate reasonable suspicion."). The Supreme Court has rejected the premise that officers must have "independent reasonable suspicion in order to question [an individual] . . . because the questioning constitute[s] a discrete Fourth Amendment event." *Muehler v. Mena*, 544 U.S. 93, 100–01 (2005).[1] Officer Varela's question—whether the men had weapons—did not unreasonably prolong the traffic stop. Varela asked limited questions of the vehicle's occupants, including

---

[1] For similar reasons, it was also permissible for Officer Varela to ask Defendant for identification. *See United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152–53 (9th Cir. 2007) (holding that a law enforcement officer could request a passengers' identification without implicating the Fourth Amendment: "The police may ask people who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure.") (citing *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.")); *see also United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("[B]ecause passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well.") (citation omitted); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("Just as the officer may ask for the identification of the driver of a lawfully stopped vehicle, so he may request identification of the passengers also lawfully stopped. No separate showing is required.").

whether the men had weapons. Given that Malara had been driving well above the posted speed limit and appeared nervous when Officer Varela asked him simple questions, and since traffic stops can be "especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), and "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation," *Wilson*, 519 U.S. at 415, it was reasonable for Varela to ask the vehicle's occupants if they were carrying weapons. Defendant has not contended, and the Court's review of the evidence discloses, that the questioning did not extend the stop's duration.

Officer Varela was also justified in removing the weapon from Defendant's pocket once he was informed of its existence. *See Willis*, 431 F.3d 717 ("Once Willis informed the officers that he was carrying a firearm, the officers were entitled to seize the firearm in order to avoid any possibility that Willis would use it against them."). Asking the question and then calmly removing the weapon from Defendant's pocket were actions "reasonably necessary to protect [Varela's] personal safety" during the traffic stop. *See Hensley*, 469 U.S. at 235.

### D. *Miranda* does not require the exclusion of Defendant's statements.

Defendant argues that his statements to Officer Varela must be suppressed because he was not Mirandized. But "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Since Defendant was not "in custody," no *Miranda* warnings were required. Officer Varela simply asked whether the men had weapons in the car—a question he as permitted to ask without needing any separate reasonable suspicion. *See Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007).

### CONCLUSION

Officer Varela had sufficient reasonable suspicion to pull over Malara's vehicle. Once he did so, he could ask questions unrelated to the traffic stop even if he did not have separate reasonable suspicion to support the question. Once Defendant stated that he had a gun in his pocket, Officer Varela was justified in removing the firearm from Defendant's

pocket for the duration of the stop to avoid any possibility that the gun would be used against him or other law enforcement officers. Finally, because Defendant was not "in custody" for purposes of *Miranda*, his statements to Officer Varela need not be suppressed.

**IT IS THEREFORE ORDERED** that the Motion to Suppress of Defendant Joseph Minh McReynolds (Doc. 33) is **DENIED**.

Dated this 3rd day of July, 2019.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge